IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

CHARLESTON DIVISION

NON-JURY

| | |
|---|---|
| HYUNDAI MERCHANT MARINE CO., LTD. ) | Civil Action No. 2:15-cv-01562-DCN |
| ) | |
| Plaintiff, ) | COMPLAINT |
| ) | |
| v. ) | |
| ) | |
| CONGLOBAL INDUSTRIES, LLC f/k/a ) | |
| CONGLOBAL INDUSTRIES, INC. and ) | |
| DRAYAGE EXPRESS, LLC, ) | |
| ) | |
| Defendants. ) | |
| ) | |

Complaining of the Defendants, the Plaintiff, Hyundai Merchant Marine Co., Ltd., alleges and says as follows:

1. The Plaintiff Hyundai Merchant Marine Co., Ltd. ("HMM") is, and was at all relevant times, a corporation duly incorporated under the laws of the Republic of Korea and with its principal place of business in country.

2. HMM is engaged, *inter alia*, in the carriage of goods for hire in the international trade..

3. Upon information and belief, the Defendant ConGlobal Industries, LLC f/k/a ConGlobal, Inc. ("ConGlobal") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located in Tinley Park, Illinois.

4. ConGlobal is engaged, *inter alia*, in the provision of equipment and cargo handling services to common and private carriers, including, but not limited to those utilizing the Port of Charleston, South Carolina.

5. Upon information and belief, the Defendant Drayage Express, LLC ("Drayage") is a corporation organized and existing under the laws of a state other than South Carolina with its principal place of business located in Philadelphia, Pennsylvania.

6. Drayage is engaged, *inter alia*, in the carriage of goods for hire from seaports, including, but not limited to the Port of Charleston, South Carolina, to inland destinations.

7. This Court has original jurisdiction pursuant to 28 U.S.C. § 1332 (Diversity of Citizenship) because the matter in controversy exceeds $75,000, exclusive of interests and costs and is between citizens of different States.

8. Venue is proper under 28 USC § 1391 because the Defendants engage in business within this judicial district.

## The Agreement

9. On May 1, 2009, HMM and ConGlobal entered into a Container Yard and Depot Agreement (the "Agreement") under which ConGlobal was to provide certain services at its facilities located in Oakland, California, Savannah, Georgia and Charleston, South Carolina. A copy of the Agreement is attached hereto and incorporated herein as Exhibit A.

10. Under the section 1.1.1 of the Agreement, ConGlobal agreed to provide the following services: "Interchanging, inspecting, handling, storing, monitoring, repairing, refurbishing, affixing license plate and providing related services as requested by Hyundai, for loaded and empty containers, cargo contained in loaded containers, chassis, generator sets and any other related hardware (hereinafter collectively and individually referred to as "Equipment") owned or leased or controlled by Hyundai."

11. In regard to loaded refrigerated containers, ConGlobal was "required to check the setting temperature against the actual temperature of Equipment" (Agreement sec. 3.4) and to provide "Continuous Monitoring, and recording daily the temperature of each refrigerated container" (Agreement sec. 1.1.2).

12. Pursuant to the Agreement, ConGlobal was "solely responsible for any loss of or damage to such Equipment or loss or damage to any cargo in any loaded Equipment" while said Equipment was on its facility (Agreement sec. 4.3) and agreed to pay HMM "an amount equal to payments made by or on behalf of [HMM] to the cargo owner for such loss, damage or destruction" (Agreement sec. 4.1).

13. In addition, section 10.1 of the Agreement obligated ConGlobal to "indemnify, defend and hold [HMM] harmless against losses, damages, expenses, claims or liabilities by reason of...damage to property of third persons..., or on account of claims, demands or suits made or brought against [HMM] by...any other third person...arising out of or in connection with the Services performed or agreed to be performed by [ConGlobal], whether based upon or resulting from negligence, omission, fault, breach of statutory duty or obligation on part of [ConGlobal],or its agents, servants, subcontractors, employees or otherwise."

14. ConGlobal further agreed in section 10.2 of the Agreement to "adjust and settle all claims made against [HMM]...arising or growing out of any liability assumed by [ConGlobal] under this Agreement for which [HMM] is liable or is alleged to be liable [and to]...defend, adjust, or settle such suits and protect, indemnify, and hold [HMM] harmless from and against all damages, judgments, decreed, attorney's fee, cost, and expenses growing out of or resulting from or incident to any such claims of suits."

### The UIIA

15. HMM and Drayage have agreed to be bound to the terms and conditions of the Uniform Intermodal Interchange and Facilities Access Agreement (UIIA). A copy of the UIIA is attached hereto and incorporated herein as Exhibit B.

16. Pursuant to section F(4)(a) of the UIIA, Drayage agreed "to defend, hold harmless and fully indemnify the [HMM] (without regard to whether [HMM's] liability is vicarious, implied in law, or as a result of the fault or negligence of the [HMM]), against any and all claims, suits, loss, damage or liability, for bodily injury, death and/or property damage, including reasonable attorney fees and costs incurred in the defense against a claim or suit…caused by or resulting from [Drayage's] use or maintenance of the Equipment during an Interchange Period….".

### The Claim

17. On or about June 28, 2010, Danmar Lines Limited and DHL Global Forwarding, acting as a Non Vessel Operating Common Carrier ("NVOCC"), received from Sanofi-Aventis Deutschland Gmbh And Sanofi-Aventis U.S. Inc. ("Cargo Interests") at Frankfurt, Germany one reefer container load of 800 packages of Lantus U100 Solostar (the "Cargo") to be carried from Frankfurt, Germany to Forest Park, Georgia, USA, via the ports of Rotterdam and Charleston at a reefer temperature setting of 5 degrees Celsius, and issued an Express Sea Waybill No. BRE147356 to Cargo Interests.

18. On or about July 3, 2010, HMM received the Cargo from the NVOCC and loaded it on board the M/V APL GARNET at Rotterdam. HMM issued to the NVOCC its Sea Waybill No. HDMURTWB0980027 for the carriage of the Cargo from Rotterdam to

Forest Park via Charleston. A copy of this Sea Waybill is attached hereto and incorporated herein as Exhibit C.

19. The Cargo was discharged from the M/V APL GARNET at Charleston on or about July 13, 2010 at which time ConGlobal's obligations under the Agreement arose in respect to the Cargo and Equipment.

20. On July 23, 2010, the Cargo and Equipment were interchanged to Drayage for transport by truck to Forest Park, Georgia where it was delivered to Cargo Interests on or about July 26, 2010.

21. Upon information and belief, the Equipment was damaged while in the custody of ConGlobal and/or Drayage resulting in the Cargo's exposure to elevated temperatures during this period.

22. Neither the aforesaid damage to the Equipment nor the elevated internal temperatures were detected by either Defendant and these conditions went unrepaired and unremedified during this period.

23. After delivery, Cargo Interests discovered that the Cargo had been damaged by the exposure to the elevated temperatures and put forward a claim against the NVOCC in the amount of USD $1,812,480 (the "Cargo Claim").

24. The NVOCC in turn sought indemnity from HMM in respect of the Cargo Claim.

25. HMM likewise sought indemnity from both ConGlobal and Drayage and offered them the opportunity to participate in the ongoing settlement negotiations with the Cargo Interests. Both Defendants refused these requests and declined to participate in the negotiations.

26. On or about September 29, 2014, HMM, the NVOCC and Cargo Interests (including their subrogated insurer) entered into a Settlement Agreement fully and finally resolving all claims relating to the damage to the Cargo. A copy of this Settlement Agreement is attached hereto and incorporated herein as Exhibit D.

27. Under the terms of the Settlement Agreement, HMM paid the sum of USD $450,000 to the Cargo Interests and both the Cargo Interests and the NVOCC unconditionally assigned all of their rights relating to the Cargo Claim to HMM.

28. This settlement of a disputed controversy was reasonable under the circumstances.

29. In addition to the sums paid in settlement of the Cargo Claim, HMM incurred costs and fees in the defense and resolution of said claim.

AS A FIRST CAUSE OF ACTION
[Breach of Implied Warranty]

30. HMM hereby realleges and reasserts the allegations contained in Paragraphs 1 through 30 of this Complaint as if fully repeated herein verbatim.

31. Defendants impliedly warranted that they would perform the contractual duties assigned to them in a workmanlike manner.

32. The Defendants' failure to detect the equipment damage and elevated internal temperatures constituted a breach of the implied warranty by Defendants rendering them liable to HMM for the amount paid in settlement of the Cargo Claim.

33. To the extent of the amount paid by HMM in settlement of the Cargo Claim, and to the extent of costs and fees incurred in the defense and resolution of the claim, HMM has been damaged by the Defendants' breach of implied warranties, and is entitled to recover such damages from Defendants.

## FOR A SECOND CAUSE OF ACTION
[Negligence]

34. HMM hereby realleges and reasserts the allegations contained in Paragraphs 1 through 34 of this Complaint as if fully repeated herein verbatim.

35. The Defendants' failure to detect the equipment damage and elevated internal temperatures and the resulting damage to the Cargo was due to, caused by, and proximately resulted from the negligence, gross negligence, carelessness, recklessness, willfulness, or wantonness of Defendants for which they are liable to HMM.

36. To the extent of the amount paid by HMM to Cargo Interests in settlement of the Cargo Claim, and to the extent of costs and fees incurred in the defense and resolution of the claim, HMM has been damaged by the Defendants' negligence, gross negligence, carelessness, recklessness, willfulness and wantonness and is entitled to recover such damages from Defendants.

37. To the extent of the value of the Cargo Claim, HMM, as the assignee of the Cargo Interests, has been damaged by the Defendants' negligence, gross negligence, carelessness, recklessness, willfulness and wantonness and is entitled to recover such damages from Defendants.

## FOR A THIRD CAUSE OF ACTION
[Duty of Indemnity]

38. HMM hereby realleges and reasserts the allegations contained in Paragraphs 1 through 38 of this Complaint as if fully set forth herein verbatim.

39. With regard to Defendants' failure to detect the equipment damage and elevated internal temperatures, Defendants, by contract and by operation of law, have a duty to HMM to indemnify it for any damages associated with the Cargo Claim.

40. To the extent of the amount paid by HMM to the Cargo Interests in settlement of the Cargo Claim, and to the extent of costs and fees incurred in the defense and resolution of the claim, HMM is entitled to recover such amounts over against the Defendants.

WHEREFORE, HMM demands judgment jointly and severally against the Defendants for the extent of the amount paid by HMM to the Cargo Interests in settlement of the Cargo Claim, the costs and fees incurred in the defense and resolution of the claim, the value of the Cargo Claim assigned to HMM, together with attorneys' fees, expenses, costs, interest and such other relief as to this Court may seem just and equitable.

WOMBLE CARLYLE SANDRIDGE & RICE, LLP

By: S/David M. Collins
DAVID M. COLLINS, ESQ.
Fed. I.D. # 223
5 Exchange Street
P.O. Box 999
Charleston, SC 29402
Tel: 843-722-3400
Fax: 843-723-7398
Email: dcollins@wcsr.com

April 8, 2015                                    Attorneys for the Plaintiff